## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
## Case No. 5:19-ct-03137-BO

| | | |
|---|---|---|
| MARGARET JEAN KELLY as Administratrix of the Estate of Graydon Jerome Parker, III, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | **AMENDED COMPLAINT** **(Jury Trial Demanded)** |
| WAYNE COUNTY, LAWRENCE M. PIERCE, JR., in his official capacity as Sheriff of Wayne County, WESTERN SURETY COMPANY, WILLIE D. SPARKS, in his individual capacity, RYAN A. NARRON, in his individual capacity, ANTHONY J. SANTAGATA, in his individual capacity, LEWIS A. GARNER, in his individual capacity, XAVIER D. LEE, in his individual capacity, BRENT A. WOODALL, in his individual capacity, JOSE F. ARIAS, in his individual capacity, ROBERT C. HINES, in his individual capacity, NATHANIEL A. NEAL, in his individual capacity, CHARLES S. GRAINGER, in his individual capacity, SOUTHERN HEALTH PARTNERS, INC., and CHRISTINA M. DRIVER, LPN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

NOW COMES Plaintiff, complaining of Defendants, and alleges and says as follows:

### INTRODUCTION

1.      At approximately 12:00 p.m., on Saturday, May 20, 2017, Graydon Jerome Parker, III, age 54, was admitted to the Wayne County Detention Center in Goldsboro, NC. Mr. Parker was arrested on the morning of May 20 by a Wayne County Deputy Sheriff for breaking the

passenger window on his neighbor's truck. According to the Deputy, Mr. Parker said that he did it "because God told me to." Mr. Parker was charged with two Class 2 misdemeanor offenses and given a $5,000 bond.

2.      At the time of his admission to the Wayne County Jail and throughout his detention on May 20, Mr. Parker was in an acute manic state and experiencing a psychiatric emergency.

3.      Despite his serious medical needs, the individual Defendants from the Wayne County Sheriff's Office and Southern Health Partners did not complete a medical or mental health screening for Mr. Parker, did not contact the Detention Center Physician, Wayne County EMS, and/or other health care providers, and did not obtain any medical treatment for him.

4.      Instead, Mr. Parker was sprayed multiple times with Oleoresin-Capsicum (OC) spray, stripped naked, and placed in a small (6' x 7') segregation cell with only a toilet/hole on the floor for nine hours. Mr. Parker's manic symptoms progressed and his mental state deteriorated throughout his detention due to the lack of any medical care.

5.      At approximately 9:37 p.m. on May 20, Mr. Parker was brought by Defendants Sergeant Xavier Lee, Detention Officer Brent Woodall, Detention Officer Jose Arias, Detention Officer Robert Hines, and Detention Officer Nathaniel Neal to the shower room at the Detention Center after he smeared feces in his cell and was extensively sprayed by them with OC spray and hot water. When he became upset in the shower, Mr. Parker was thrown to the floor and repeatedly kicked, stomped, and punched by Defendants Lee, Woodall, Hines, Arias, and Neal all over his body and head.

6.      After the attack, Mr. Parker was on the floor naked, bleeding, breathing heavily, and talking incoherently. Instead of obtaining medical treatment for him, Defendants Lee,

2

Woodall, Hines, Arias, and Neal decided to hog-tie Mr. Parker on his stomach by pulling his arms and legs behind his back and applying handcuffs, leg shackles, and a hobble restraint.

7.      While restraining Mr. Parker and applying the hog-tie, these Defendants sprayed him with OC spray, forced him onto his stomach, used a Nova electronic stun shield to shock him and push down on his back, shackled his legs behind his back, applied a handcuff to his wrist, kicked and stomped him, held him face-down with their bodies and legs, punched him multiple times in the head, face, and body, kneed him, shocked him with a Taser X26 stun gun, and applied a choke hold.

8.      Defendant Trooper Charles Grainger watched the detention officers attack Mr. Parker in the shower room. Defendant Grainger assisted the officers with their efforts to hog-tie Mr. Parker and encouraged them to "knock him out." While the officers were restraining Mr. Parker on his stomach, Defendant Grainger shocked Parker with a Taser X2 stun gun in drive-stun mode two times and deployed electric barbs into him two times. Once Mr. Parker was unconscious, Defendant Lee secured the handcuffs behind Parker's back, applied the hobble restraint from the shackles to the handcuffs, and left him on his stomach in a hog-tie position. Several minutes later, Defendant Grainger realized that Mr. Parker was turning blue and not breathing.

9.      Mr. Parker suffered sudden cardiac arrest from the blunt force trauma, physical restraints, OC spray, conductive electrical weapon applications, and positional asphyxia while being held in a prone position by Defendants Lee, Woodall, Hines, Arias, Neal, and Grainger.

10.     Mr. Parker was taken by Wayne County EMS to Wayne Memorial Hospital in an unconscious state. Mr. Parker never regained consciousness and he was pronounced dead at 2:35 p.m. on May 21, 2017 at Wayne Memorial Hospital.

11.     Plaintiff, as the Administratrix of the Estate of Graydon Jerome Parker, III, brings this civil action, pursuant to 42 U.S.C. § 1983, against (a) the individual Defendants for deliberate indifference to the serious medical needs of Mr. Parker in violation of his substantive due process rights under the Fourteenth Amendment, and (b) Defendants Lee, Woodall, Hines, Arias, Neal, and Grainger for the use of excessive force against Mr. Parker in violation of his due process rights under the Fourteenth Amendment.

12.     Plaintiff brings this civil action, pursuant to 42 U.S.C. § 1983, against (a) Defendants Wayne County, Sheriff Pierce, and Southern Health Partners for their respective policies and/or customs of deliberate indifference to the serious medical needs of prisoners, like Jerry Parker, with mental health disorders, in violation of the Fourteenth Amendment, and (b) Defendant Sheriff Pierce for deliberate indifference to the inadequate training of the detention officers on the risks of positional asphyxia while restraining a prisoner, like Mr. Parker, in a prone position, in violation of the Fourteenth Amendment.

13.     In the alternative, Plaintiff seeks to hold Defendant Southern Health Partners liable, pursuant to 42 U.S.C. § 1983, for the deliberate indifference of its employee, Defendant Christina M. Driver, LPN, under the doctrine of *Respondeat Superior*.[1]

14.     Finally, Plaintiff brings an official bond action under N.C. Gen. Stat. § 58-76-5 against Defendants Sheriff Pierce and Western Surety Company, and a medical malpractice action

---

[1] Although Plaintiff recognizes that a policy or custom must be established under existing Fourth Circuit case law against a private corporation, a nonfrivolous argument exists for modifying or reversing the existing law and/or establishing new law to support a *Respondeat Superior* claim under 42 U.S.C. § 1983 against Defendant Southern Health Partners. *See Shields v. Illinois Dep't of Corrections*, 746 F.3d 782 (7th Cir. 2014) (expressing doubt about whether private corporations should be insulated from *Respondeat Superior* liability under 42 U.S.C. § 1983).

under North Carolina law against Defendants Southern Health Partners and Christina M. Driver, LPN.

15.     Plaintiff seeks to recover compensatory damages from Defendants for Mr. Parker's personal injuries and wrongful death. Plaintiff also seeks to recover punitive damages from the individual Defendants and Defendant Southern Health Partners under federal law and from Defendants Southern Health Partners and Christina M. Driver, LPN under state law.

## JURISDICTION AND VENUE

16.     Plaintiff, as Administratrix of the Estate of Graydon Jerome Parker, III, brings this civil action under 42 U.S.C. § 1983 for acts committed by Defendants under color of state law which deprived Mr. Parker of his due process rights as a pre-trial detainee to be free from deliberate indifference to his serious medical needs and the use of excessive force under the Fourteenth Amendment to the United States Constitution.

17.     Plaintiff's action arises under the Constitution and laws of the United States.

18.     The Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 1343(a)(4).

19.     The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     Under 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Eastern District of North Carolina because all of the events giving rise to this action occurred in the Eastern District.

21.     The Western Division is the proper division for this case in the Eastern District of North Carolina.

22.     This is a wrongful death action under N.C. Gen. Stat. § 28A-18-2 to recover damages for Mr. Parker's wrongful death.

23.     This is also a survival action under N.C. Gen. Stat. § 28A-18-1 to recover damages for Mr. Parker's personal injuries.

## PARTIES

### A.     Plaintiff

24.     Plaintiff Margaret Jean Kelly is a citizen and resident of Goldsboro in Wayne County, North Carolina. She is 74 years old.

25.     Plaintiff is the Administratrix of the Estate of Graydon Jerome Parker, III. Plaintiff was duly appointed Administratrix of the Estate by the Clerk of Superior Court in Wayne County file no. 17-E-694.

26.     Plaintiff is the mother of the late Graydon Jerome Parker, III ("Jerry Parker" or "Mr. Parker").

27.     Jerry Parker was born in 1963. He was 54 years old when he died in Wayne County on May 21, 2017.

28.     Mr. Parker's sole heir at law is his mother, Plaintiff Margaret Jean Kelly. Mr. Parker's father died on October 6, 1998. Mr. Parker never had any children and he was not married at the time of his death.

### B.     Defendants Wayne County, Sheriff Pierce, and Western Surety

29.     Defendant Wayne County is a North Carolina county organized and existing under N.C. Gen. Stat. § 153A-10.

30.     Defendant Wayne County has all of the corporate powers set forth in N.C. Gen. Stat. § 153A-11, including the power to be sued.

6

31.     Defendant Wayne County is a "unit" and "local government" under N.C. Gen. Stat. § 153A-216, *et seq.*

32.     Defendant Wayne County has the powers to establish, acquire, erect, repair, maintain, and operate a local confinement facility, also known as a detention facility or jail.

33.     Defendant Wayne County maintains and operates the Wayne County Detention Center facility, located at 207 East Chestnut Street, Goldsboro, NC 27530. The Detention Center consists of 7 floors and is designed to house approximately 200 prisoners (178 male beds and 22 female beds).

34.     Defendant Wayne County is responsible, under N.C. Gen. Stat. § 153A-225, for developing an adequate medical plan to provide medical care to prisoners at the Wayne County Detention Center, including the medical supervision of prisoners and emergency medical care for prisoners to the extent necessary for their health and welfare. *See Stockton v. Wake County*, 173 F.Supp.3d 292, 303-04 (E.D.N.C. 2016).

35.     At all times relevant to this action, Defendant Wayne County had final policymaking authority over the provision of medical care and emergency medical care to prisoners at the Wayne County Detention Center. *See Vaught v. Ingram*, 2011 U.S. Dist. LEXIS 18231 at [*8-12], No. 5:10-CT-3009-FL (E.D.N.C. 2011).

36.     Defendant Wayne County is sued under 42 U.S.C. § 1983 for an official policy or custom of deliberate indifference to the serious medical needs of prisoners, like Jerry Parker, with mental health disorders at the Wayne County Detention Center.

37.     Defendant Lawrence M. Pierce, Jr. ("Sheriff Pierce") is a citizen and resident of Wayne County.

38.     Defendant Sheriff Pierce is the duly elected Sheriff of Wayne County.

7

39.     Defendant Sheriff Pierce is sued in his official capacity only.

40.     Defendant Sheriff Pierce is responsible for the care and custody of the prisoners at the Wayne County Detention Center under N.C. Gen. Stat. § 162-22.

41.     Defendant Sheriff Pierce has an affirmative nondelegable duty to provide medical care, including mental health services, to the prisoners at the Wayne County Detention Center under N.C. Gen. Stat. § 153A-221. *See State v. Wilson*, 183 N.C. App. 100, 104, 643 S.E.2d 620, 623 (2007).

42.     At all times relevant to this action, Defendant Sheriff Pierce had final policymaking authority at the Wayne County Sheriff's Office for the provision of medical care and emergency medical care to prisoners at the Wayne County Detention Center.

43.     Defendant Sheriff Pierce is responsible for appointing, employing, training, and supervising the detention officers and deputy sheriffs at the Wayne County Detention Center.

44.     At the time of the events alleged herein, Defendant Sheriff Pierce had appointed Major Fane Greenfield, pursuant to N.C. Gen. Stat. § 162-22, to serve as the Chief Jailer and Keeper of the Wayne County Detention Center.

45.     Under General Order #3 of the Wayne County Detention Center, Sheriff Pierce designated Major Greenfield as the person responsible for ensuring that adequate health care services were provided to all prisoners in the Wayne County Detention Center.

46.     At all times relevant to this action, Defendant Sheriff Pierce had final policymaking authority at the Wayne County Sheriff's Office for the training and supervision of the detention officers and the deputy sheriffs at the Wayne County Detention Center. *See Vaught v. Ingram*, 2011 U.S. Dist. LEXIS 18231 at [*12-14], No. 5:10-CT-3009-FL (E.D.N.C. 2011).

47.     Defendant Sheriff Pierce is sued under 42 U.S.C. § 1983 for a policy or custom of deliberate indifference to the serious medical needs of prisoners, like Jerry Parker, with mental health disorders at the Wayne County Detention Center.

48.     Defendant Sheriff Pierce is also sued under 42 U.S.C. § 1983 for a policy or custom of deliberate indifference to the inadequate training of detention officers at the Wayne County Detention Center on the risks of positional asphyxia while restraining a prisoner, like Mr. Parker, in a prone position.

49.     Defendant Sheriff Pierce has an official bond that was issued by Defendant Western Surety Company in the amount of $25,000 as required by N.C. Gen. Stat. § 162-6. This official bond was in effect at the time of the events alleged herein.

50.     Defendant Sheriff Pierce is sued under N.C. Gen. Stat. § 58-76-5 as the principal on the official bond.

51.     Defendant Sheriff Pierce has waived governmental immunity for Plaintiff's claim under N.C. Gen. Stat. § 58-76-5 to the extent of the bond.

52.     Defendant Western Surety Company is a South Dakota corporation that is duly licensed to conduct business in the State of North Carolina.

53.     Defendant Western Surety Company is sued as the surety on Defendant Sheriff Pierce's official bond, pursuant to N.C. Gen. Stat. § 58-76-5.

## C.     Individual Defendants

54.     Defendant Willie D. Sparks is a citizen and resident of Wayne County.

55.     At the time of the events alleged herein, Defendant Sparks was employed by the Wayne County Sheriff's Office as a detention officer with the rank of Sergeant.

56.     Defendant Ryan A. Narron is a citizen and resident of Wayne County.

9

57.     At the time of the events alleged herein, Defendant Narron was employed by the Wayne County Sheriff's Office as a detention officer with the rank of Corporal.

58.     Defendant Anthony J. Santagata is a citizen and resident of Wayne County.

59.     At the time of the events alleged herein, Defendant Santagata was employed by the Wayne County Sheriff's Office as a detention officer.

60.     Defendant Lewis A. Garner is a citizen and resident of Wayne County.

61.     At the time of the events alleged herein, Defendant Garner was employed by the Wayne County Sheriff's Office as a detention officer.

62.     On May 20, 2017, Defendants Sparks, Narron, Santagata, and Garner worked the dayshift from 7:00 a.m. until 7:00 p.m. at the Wayne County Detention Center.

63.     At all times relevant to this action on May 20, 2017, Defendants Sparks, Narron, Santagata, and Garner were acting under color of state law as detention officers employed by the Wayne County Sheriff's Office.

64.     Defendants Sparks, Narron, Santagata, and Garner are each sued in their individual capacity under 42 U.S.C. § 1983.

65.     During their interactions with Jerry Parker, as alleged herein, Defendants Sparks, Narron, Santagata, and Garner acted in accordance with Sheriff Pierce's policy or custom of deliberate indifference to the serious medical needs of prisoners with mental health disorders at the Wayne County Detention Center.

66.     Defendant Xavier D. Lee is a citizen and resident of Duplin County.

67.     At the time of the events alleged herein, Defendant Lee was employed by the Wayne County Sheriff's Office as a detention officer with the rank of Sergeant. He was 27 years old, 6' 1" tall, and weighed 245 pounds.

68. Defendant Brent A. Woodall is a citizen and resident of Wayne County.

69. At the time of the events alleged herein, Defendant Woodall was employed by the Wayne County Sheriff's Office as a detention officer. He was 27 years old, 6' 4" tall, and weighed 205 pounds.

70. Defendant Jose F. Arias is a citizen and resident of Wayne County.

71. At the time of the events alleged herein, Defendant Arias was employed by the Wayne County Sheriff's Office as a detention officer. He was 24 years old, 5' 10" tall, and weighed 240 pounds.

72. Defendant Robert C. Hines is a citizen and resident of Wayne County.

73. At the time of the events alleged herein, Defendant Hines was employed by the Wayne County Sheriff's Office as a detention officer. He was 25 years old, 6' 2" tall, and weighed 195 pounds.

74. Defendant Nathaniel A. Neal is a citizen and resident of Wayne County.

75. At the time of the events alleged herein, Defendant Neal was employed by the Wayne County Sheriff's Office as a detention officer. He was 22 years old, 5' 8" tall, and weighed 130 pounds.

76. On May 20, 2017, Defendants Lee, Woodall, Arias, Hines, and Neal worked the evening shift beginning at 7:00 p.m. at the Wayne County Detention Center.

77. At all times relevant to this action on May 20, 2017, Defendants Lee, Woodall, Arias, Hines, and Neal were acting under color of state law as detention officers employed by the Wayne County Sheriff's Office.

78. Defendants Lee, Woodall, Arias, Hines, and Neal are each sued in their individual capacity under 42 U.S.C. § 1983.

79. During their interactions with Jerry Parker, as alleged herein, Defendants Lee, Woodall, Aris, Hines, and Neal acted in accordance with (a) Sheriff Pierce's policy or custom of deliberate indifference to the serious medical needs of prisoners with mental health disorders at the Wayne County Detention Center, and (b) Sheriff Pierce's policy or custom of inadequate training on the risks of positional asphyxia while restraining a prisoner in a prone position.

80. Defendant Charles C. Grainger is a citizen and resident of Wayne County.

81. At the time of the events alleged herein, Defendant Grainger was employed by the North Carolina State Highway Patrol as a sworn law enforcement officer with the rank of Trooper. He was 36 years old, 6' 2" tall, and weighed 220 pounds.

82. Before he became a Trooper, Defendant Grainger worked as a correctional officer with the N.C. Department of Correction (now known as the Division of Adult Correction) for over 11 years.

83. At all times relevant to this action, Defendant Grainger was acting under color of state law as a Trooper employed by the N.C. State Highway Patrol.

84. Defendant Grainger is sued in his individual capacity under 42 U.S.C. § 1983.

**D.    Defendants Southern Health Partners and Christina M. Driver, LPN**

85. Defendant Southern Health Partners, Inc. is a Delaware corporation.

86. Defendant Southern Health Partners maintains a registered office in Wake County, NC and its principal place of business is located in Chattanooga, Tennessee.

87. Defendant Southern Health Partners is a private for-profit corporation that is in the business of providing correctional health care services under contract with local governments.

88. Defendant Southern Health Partners contracts with more than 200 county and city correctional facilities in 15 states, including North Carolina.

12

89.     Defendant Southern Health Partners advertises itself "as a leading provider of affordable medical, dental, and mental health services to inmates in county and city jail facilities."

90.     At all times relevant to this action, Defendant Southern Health Partners provided medical, dental, and mental health services to prisoners at the Wayne County Detention Center under a Health Services Agreement, dated June 17, 2014, between Wayne County and Southern Health Partners, Inc. as amended by Amendment #1, dated March 10, 2015, and Amendment #2, dated February 1, 2017 (collectively, "Health Services Agreement").

91.     The initial Health Services Agreement, dated June 17, 2014, was signed by the Chairman of the Wayne County Board of Commissioners. Amendment #1 was signed by Sheriff Pierce for Wayne County, and Amendment #2 was jointly signed by Sheriff Pierce and the County Manager for Wayne County.

92.     Under the Health Services Agreement, Defendant Southern Health Partners agreed to provide medical, dental, and mental health services to prisoners at the Wayne County Detention Center from September 1, 2016 through June 30, 2017 in exchange for base compensation from Wayne County in the amount of $32,492.24 per month (annualized price of $389,906.88).

93.     The terms of the Health Services Agreement required Defendant Southern Health Partners to perform the following services at the Wayne County Detention Center:

   a. Provide medical care to all prisoners (excluding those in outside hospitals or other medical facilities) beginning with the booking and physical placement of the inmate into the jail;

   b. Provide and/or arrange for all professional medical, dental, mental health and related health care and administrative services for the prisoners, regularly scheduled sick call, nursing care, regular physician care, medical specialty services, emergency medical care, emergency ambulance services when medically necessary, medical records management, pharmacy services management, administrative support services, and other services described in the Agreement;

13

c.  Be financially responsible for the costs of all physician and nurse staffing, over-the-counter medications, medical supplies, on-site clinical lab procedures, medical hazardous waste disposal, office supplies forms, folders, files, travel expenses, publications, administrative services and nursing time to train officers in the jail on various medical matters;

d.  Be financially responsible for the costs of prescription pharmaceuticals for Wayne County prisoners (subject to certain exclusions);

e.  Arrange and/or provide emergency medical care, as medically necessary, to inmates through arrangements to be made by Southern Health Partners;

f.  Arrange all emergency ambulance transportation of prisoners when medically necessary;

g.  Provide medical and support personnel reasonably necessary for the rendering of health care services to prisoners at the jail, subject to an allowance for medical staff vacation and sick days and flexible coverage on holidays;

h.  Ensure that all personnel provided or made available by Southern Health Partners to render services under the Agreement are licensed, certified or registered in their respective areas of expertise as required by applicable North Carolina law;

i.  Maintain a complete and accurate medical record for each prisoner who has received health care services, which shall be available, at all times, to Wayne County as custodian of the person of the patient;

j.  Provide Wayne County regular reports relating to services rendered under the Agreement.

94.     From September 1, 2014 through May 20, 2017, Defendant Southern Health Partners did not employ any mental health providers at the Wayne County Detention Center and only had a single LPN, without any on-site medical supervision, present at the Detention Center from 8:00 a.m. until 12:00 p.m. on Monday-Saturday (excluding holidays).

95.     During the months of September 2016 through June 2017, the average daily population at the Wayne County Detention Center was 188 prisoners, with a monthly average daily population of up to 234 prisoners.

96. On May 20, 2017, there were 150 male and 25 female prisoners at the Wayne County Detention Center.

97. At all times relevant to this action, Defendant Southern Health Partners acted under color of state law while providing health care services at the Wayne County Detention Center.

98. Defendant Southern Health Partners is sued under 42 U.S.C. § 1983 for a policy or custom of deliberate indifference to the serious medical needs of prisoners, like Jerry Parker, with mental health disorders at the Wayne County Detention Center.

99. Defendant Christina M. Driver is a citizen and resident of Duplin County, NC.

100. At all times relevant to this action, Defendant Driver was a duly licensed practical nurse who was approved to practice certain assigned nursing activities and responsibilities, as set forth in N.C. Gen. Stat. § 90-171.20 and 21 N.C. Admin. Code § 36.0225, under the supervision of a registered nurse, advanced practice registered nurse (such as a nurse practitioner), or licensed physician.

101. At the time of the events alleged herein, Defendant Driver was employed by Defendant Southern Health Partners as a licensed practical nurse at the Wayne County Detention Center.

102. At all times relevant to this action on May 20, 2017, Defendant Driver was acting under color of state law as a licensed practical nurse employed by Southern Health Partners at the Wayne County Detention Center.

103. Defendant Driver is sued in her individual capacity under 42 U.S.C. § 1983 and North Carolina law.

104. During her interactions with Jerry Parker, as alleged herein, Defendant Driver acted in accordance with Defendant Southern Health Partners' policy or custom of deliberate

indifference to the serious of medical needs of prisoners with mental health disorders at the Wayne County Detention Center.

105.    Defendant Driver was acting within the course and scope of her employment with Defendant Southern Health Partners during her interactions with Mr. Parker.

106.    In the alternative, Defendant Southern Health Partners is sued under 42 U.S.C. § 1983 for vicarious liability pursuant to the doctrine of *Respondeat Superior*.

107.    At all times relevant to this action, Defendant Driver was a health care provider as defined in N.C. Gen. Stat. § 90-21.11.

108.    Defendants Driver and Southern Health Partners were Jerry Parker's treating health care providers at the Wayne County Detention Center on May 20, 2017.

109.    In addition to Plaintiff's civil rights claims, this is a medical malpractice action under North Carolina law arising out of Defendant Driver's failure to comply with the applicable standard of care under N.C. Gen. Stat. § 90-21.12 in her care of Mr. Parker.

110.    At all times relevant to this action, Defendant Wayne County was the custodian of all medical records generated by Defendant Southern Health Partners and its employees and agents in connection with health care services provided to prisoners at the Wayne County Detention Center.

111.    On December 17, 2018, Plaintiff sent a certified letter with a HIPAA authorization to Defendants Sheriff Pierce and Wayne County requesting a complete copy of Mr. Parker's medical and mental health records.

112.    On January 17, 2019, Defendant Wayne County responded to the letter, with a copy to Sheriff Pierce, by not producing any medical or mental health records for Mr. Parker from his pretrial detention at the Wayne County Detention Center.

113. Upon information and belief, Defendant Southern Health Partners and its nursing staff did not generate and maintain any medical or mental health records from Mr. Parker's pretrial detention at the Wayne County Detention Center on May 20, 2017.

114. The medical care provided to Mr. Parker by Defendant Driver, and all medical records pertaining to the alleged negligence and gross negligence that are available to the Plaintiff after a reasonable inquiry, have been reviewed by a board-certified nurse practitioner who is reasonably expected to qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence and is willing to testify that the medical care provided by Defendant Driver did not comply with the applicable standard of care for a licensed practical nurse.

115. Defendant Southern Health Partners is sued under North Carolina law, pursuant to the doctrine of *Respondeat Superior*, for the medical malpractice committed by Defendant Driver.

116. Defendant Driver was named in the Complaint as Defendant Jane Doe, LPN because Plaintiff did not know her identity and she was not identified in the SBI investigative report or documents from Mr. Parker's arrest and pretrial detention on May 20, 2017.

117. On May 7, 2019, Plaintiff asked counsel for Defendant Southern Health Partners to disclose the name of Defendant Jane Doe, LPN.

118. On May 31, 2019, counsel for Defendant Southern Health Partners informed Plaintiff that a nurse named Christina Driver worked at the Wayne County Detention Center on May 20, 2017, but Southern Health Partners could not verify that she was Jane Doe, LPN.

119. Plaintiff also attempted to discover the identify of Jane Doe, LPN by contacting counsel for Defendants Sheriff Pierce and Wayne County and counsel for Defendants Sparks and Narron.

120.    On June 12, 2019, Plaintiff independently confirmed that Defendant Driver was the nurse identified as Defendant Jane Doe, LPN in the Complaint.

121.    The claims against Defendant Driver in this Amended Complaint should relate back to the date when the Complaint was filed.

## FACTUAL ALLEGATIONS

122.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

### A.    Jerry Parker - Background

123.    Jerry Parker was born in 1963 in Kinston, NC. Mr. Parker grew up in Goldsboro and he graduated from Goldsboro High School.

124.    Mr. Parker served two years in the United States Army in the 82nd Airborne Division. He was discharged from the Army in or around 1984.

125.    Mr. Parker completed courses in welding at Southeastern Community College in Whiteville and Wayne Community College in Goldsboro.

126.    From the late 1990s until his death, Mr. Parker resided at 620 Sanderson Road, Seven Springs, NC 28578. Seven Springs is a small town in Wayne County.

127.    Mr. Parker lived approximately 20 minutes from his mother, Plaintiff Margaret Jean Kelly, in Goldsboro. Jerry Parker and his mother had a very close relationship. Plaintiff depended on her son for assistance and emotional support.

128.    Jerry Parker had a history of alcoholism, depression, and anxiety. In addition, he experienced manic episodes where he would have frenetic energy and would not sleep for periods of time.

129.     Due to his history of alcoholism and mental health issues, Mr. Parker was arrested and booked at the Wayne County Detention Center for driving while impaired and a corresponding probation violation in March 1998, June 1999, October 2002, July 2003, May 2004, and January 2005.

130.     During these bookings, Mr. Parker was cooperative during the medical screening process and was not considered a jail suicide risk. Mr. Parker reported some medical issues, including problems with his lungs, bloody stool, acid reflux, colitis, and a back injury.

131.     In April 2014, Mr. Parker quit drinking alcohol. According to his medical records, Mr. Parker never resumed drinking alcohol before his death.

132.     In October 2014, Mr. Parker's primary care physician, Dr. Jeffrey Margolis, prescribed him Lamotrigine/Lamictal, a medication which is commonly used to treat bipolar disorder, after he reported some mood changes while taking Gabapentin.

133.     Mr. Parker had chronic musculoskeletal pain. In 2016, he was prescribed Dexamethasone (a corticosteroid medication) which decreased his musculoskeletal pain and gave him a happier outlook on life according to his medical records.

134.     On January 5, 2017, Dr. Margolis reported in his medical notes that Mr. Parker was feeling well with minor complaints.

**B.     Mental Health Policies and Training at the Wayne County Detention Center**

135.     On February 14, 2014, Defendant Lawrence M. Pierce, Jr. was sworn in as the Wayne County Sheriff and became the chief law enforcement officer in Wayne County.

136.     On September 1, 2014, Defendant Southern Health Partners began providing all medical and mental health services to prisoners at the Wayne County Detention Center under the initial Health Services Agreement, dated June 17, 2014.

137.     Defendant Wayne County primarily decided to contract with Defendant Southern Health Partners because of the "affordability" of the health care services offered by Southern Health Partners.

138.     During the initial term of the Health Services Agreement, the base compensation rate paid by Defendant Wayne County to Southern Health Partners was $22,700 per month ($272,400 annually) based upon an average daily inmate population of up to 230. The base compensation rate increased by 2% during the second and third terms before Southern Health Partners renegotiated an increase of nearly $10,000 per month, effective February 1, 2017.

139.     Before May 20, 2017, Defendants Sheriff Pierce and Wayne County knew that Defendant Southern Health Partners provided "affordable" health care services by not employing any mental health providers at the Wayne County Detention Center and only having a single LPN present at the Detention Center without any on-site medical supervision from 8:00 a.m. until 12:00 p.m. Monday-Saturday (excluding holidays).

140.     Defendant Southern Health Partners employed Chanson A. DeVaul, D.O. from Wilson Intermediate Care in Wilson, N.C. as its responsible physician at the Wayne County Detention Center. Dr. DeVaul's practice was more than 25 miles from the Detention Center. Upon information and belief, Dr. DeVaul was only available once per week at the Detention Center.

141.     Nationally, the average rate of mental illness for men in correctional facilities (jails and prisons) was between 20-30% during the years 2014-2017. *See Braggs v. Dunn*, 257 F.Supp.3d 1171, 1201 (M.D. Ala. 2017). The same rate of mental illness existed at the Wayne County Detention Center between September 2014 and the end of May 2017.

142. Before May 20, 2017, Defendants Sheriff Pierce, Wayne County, and Southern Health Partners were aware that a significant number of prisoners at the Wayne County Detention Center had mental health issues and needed to receive appropriate treatment.

143. Despite the prevalence of prisoners with serious mental health needs, on and before May 20, 2017, there were no mental health providers at the Wayne County Detention Center and no mental health care or treatment available for prisoners at the Detention Center. Furthermore, the LPNs at the Detention Center had inadequate training, supervision, and education to properly assess, monitor, and obtain treatment for prisoners with serious mental health needs.

144. Defendants Sheriff Pierce, Wayne County, and Southern Health Partners allowed prisoners with serious mental health needs to be placed and held in segregation cells at the Wayne County Detention Center for extended periods of time without an adequate assessment or monitoring by a qualified medical or mental health provider.

145. In connection with their employment with Defendant Sheriff Pierce, the detention officers at the Wayne County Detention Center were required to complete the Detention Officer Certification Course approved by the N.C. Sheriff's Education & Training Standards Commission. In 2016 and 2017, the Course was a total of 172 hours, of which 11 hours was devoted to mental health issues (Suicides and Crisis Management:  5 hours; Aspects of Mental Illness: 6 hours). The Detention Center Certification Course provided basic training to the detention officers with the expectation that law enforcement agencies would provide additional in-service training.

146. Before May 20, 2017, Defendant Sheriff Pierce did not provide any in-service training to the detention officers at the Wayne County Detention Center on mental health screening, assessing and identifying mental health problems, handling prisoners with mental health issues, mental health crisis intervention, or use of force on mentally ill prisoners.

21

147. Defendant Sheriff Pierce was aware that in-service mental health training was needed for the detention officers due to the number of prisoners with mental health issues that were admitted at the Detention Center. Defendant Sheriff Pierce was also aware that the detention officers had failed to obtain treatment for mentally ill prisoners at the Detention Center with serious medical needs on other occasions and used force when the prisoners' mental health conditions deteriorated in custody.

148. Excluding the suicidal risk policy (General Order #05), the only written mental health policies that Defendant Sheriff Pierce had at the Detention Center as of May 20, 2017 were:

    a. General Order #02 (Classification Procedures – Inmates): "Mentally ill and mentally retarded inmates shall be housed separately from other inmates."

    b. General Order #03 (Medical Screening – Inmates), Paragraph 11: "A Mental Health Screening form will be completed during the booking process, unless exigent circumstances exist, i.e., disruptive inmate, intoxicated inmate beyond reasonable comprehension levels."

149. Defendant Sheriff Pierce's written mental health policies and training were inadequate.

150. Due to the Sheriff's mental health screening policy, a prisoner in an acute psychiatric emergency who was perceived as "disruptive" or "intoxicated beyond reasonable comprehension levels" would not receive a mental health screening, would be placed in segregation and stripped of all clothing, and would be subject to the application of oleoresin-capsicum (OC) spray and/or physical harm from the detention officers.

151. In February 2016, Defendants Sheriff Pierce, Southern Health Partners, and Wayne County approved a Medical Plan for the Wayne County Detention Center.

152. The Medical Plan specified that "the Detention Officer shall complete a Receiving Officer's Screening Form (Appendix #1)" and "During admission a Medical Screening Form

(Appendix #2) and a Mental Health Screening Form (Appendix #3) shall be completed for each prisoner."

153.    On and before May 20, 2017, Defendants Sheriff Pierce, Southern Health Partners, and Wayne County knew that the Sheriff's mental health screening policy was inconsistent with the Medical Plan and that detention officers at the Wayne County Detention Center were not complying with the mental health screening requirement in the Medical Plan.

154.    In addition, before May 20, 2017, Defendant Sheriff Pierce was aware that detention officers at the Wayne County Detention Center frequently restrained prisoners in a prone position after the use of OC spray, conductive electrical weapons, and/or physical force, including the application of a hobble restraint to hog-tie a prisoner's arms and legs behind his or her back.

155.    Defendant Sheriff Pierce knew prisoners who were restrained face-down in a prone position were at risk of positional asphyxia, especially prisoners with the following risk factors: (a) physically large, (b) obese, (c) with a restricted or impeded airway, (d) under the influence of alcohol or an intoxicating substance, (e) after being sprayed with OC spray, (f) after being shocked with a conductive electrical weapon, and/or (f) while in a state of agitated or excited delirium.

156.    Positional asphyxia is a form of asphyxia or suffocation which occurs when a person's position prevents him from breathing adequately. Positional asphyxia can cause unconsciousness and death.

157.    The risks of positional asphyxia during prone restraint are well-recognized in the law enforcement and correctional communities. For example, in June 1995, the National Law Enforcement Technology Center, a program of the U.S. Department of Justice, issued a bulletin for law enforcement agencies entitled, "Positional Asphyxia – Sudden Death," which warned of

the risks of positional asphyxia when a person was restrained in a prone position and recommended procedural protocols and training for officers to minimize the risks.

158.    As of May 20, 2017, Defendant Sheriff Pierce did not have any policies at the Wayne County Detention Center addressing positional asphyxia and did not provide any in-service training to the detention officers at the Wayne County Detention Center on the risks of positional asphyxia during the prone restraint of a prisoner.

**C.    Saturday, May 20, 2017 - Arrest**

159.    On May 1, 2017, Mr. Parker saw Dr. Margolis and reported that he was feeling well. As a result, Dr. Margolis changed his Dexamethasone prescription to decrease/taper for 16 days before it ended. Mr. Parker was scheduled for a follow-up visit with Dr. Margolis on May 24, 2017.

160.    In May 2017, Mr. Parker was 54 years old, 5' 11" tall, and he weighed 277 pounds. He had a large stomach and was medically obese.

161.    During the evenings of May 18 and May 19, 2017, after his Dexamethasone taper ended, Mr. Parker was agitated, sleeping poorly, and in tremendous musculoskeletal pain.

162.    Mr. Parker was taking Promethazine for nausea and Benadryl, but was not consuming any alcohol, drugs, or other medication.

163.    On the morning of Saturday, May 20, 2017, Jerry Parker was at his residence in Seven Springs.

164.    At 10:25 a.m. on Saturday, May 20, 2017, David Price called 911 to report that his neighbor, Mr. Parker, had broken the passenger window of his 2004 Chevrolet Silverado with an axe handle.

165. Before he discovered the broken window, Mr. Price saw Mr. Parker walking around his vehicle. When Mr. Price tried to confront Mr. Parker, he casually walked across the road.

166. Wayne County Deputy Tyler R. Kelly responded to the 911 call. Deputy Kelly found Mr. Parker across the road from Mr. Price's residence lying in the high grass. Mr. Parker was wearing a burgundy shirt, light shorts, burgundy hat/beret, white shoes, and a necklace with a sink stopper attached to it.

167. Mr. Parker told Deputy Kelly to "Go ahead and lock me up" and "I knocked that window out." When Deputy Kelly asked him "why," Mr. Parker replied, "Because God told me to." Deputy Kelly decided to arrest Mr. Parker.

168. Mr. Parker was lying on his stomach with his hands under his chin/face. After Deputy Kelly handcuffed him, Mr. Parker refused to stand up. Deputy Kelly had to pick him up off the ground and escort him to the patrol car.

169. Mr. Parker refused to sit in the patrol car. When Deputy Kelly used a pressure point technique, Parker sat down in the car. He wrapped his feet around the passenger seat headrest and kicked the computer. Deputy Kelly struck Mr. Parker on the shin and knee area with a flashlight and Parker moved his legs back.

170. While driving to the Wayne County Detention Center, Deputy Kelly heard Mr. Parker singing and mumbling. He also observed that Parker had a "thousand-yard stare."

171. Upon arrival at the Detention Center, Mr. Parker lay down in the patrol car. Wayne County Deputy Mitchell assisted Deputy Kelly with forcibly removing Mr. Parker from the patrol car. Deputy Mitchell allowed Mr. Parker's head to hit the pavement when he was pulled from the patrol car. Mr. Parker was not provided any medical care.

172. At approximately 11:40 a.m., Mr. Parker was escorted by Deputy Kelly and Defendant Narron into the Wayne County Detention Center and brought before Magistrate Howard.

173. Mr. Parker was charged with injury to personal property and resisting an officer, two Class 2 misdemeanor offenses, and ordered to post a $5,000 bond.

174. Following his arrest on the morning of May 20, 2017, Mr. Parker was a pretrial detainee while in the custody of the Wayne County Sheriff's Office.

175. Based on his interactions with Mr. Parker, Deputy Kelly thought Parker was probably "on something."

176. Upon information and belief, Deputy Kelly informed Defendants Narron, Sparks, Santagata, and/or Garner of his interactions with Mr. Parker.

**D.      Saturday, May 20, 2017 – Booking and Admission**

177. At approximately 12:16 p.m., Jerry Parker was brought to the intake area at the Wayne County Detention Center for booking and admission to the jail.

178. The booking officer was A.L. Barron and the search officer was Defendant Narron. Defendant Sparks, Defendant Santagata, and Detention Officer Shaun Daughtry provided assistance during the booking and admission process.

179. Defendant Narron searched Mr. Parker in the intake area and removed his belt. Mr. Parker was mumbling to himself and the detention officers could not understand him.

180. After the search, Mr. Parker went limp while sitting on a bench, slid to the ground, and laughed. He began yelling incoherently and not following verbal commands by the officers to stand up. When three officers tried to stand Mr. Parker up, he went limp on the floor again. Mr. Parker's behavior was abnormal but he did not take any aggressive actions towards the officers.

181.     Ronnie Levi Barnes, a prisoner who was present in the intake area, observed that, Mr. Parker was yelling, "talking out of his head," and sounded like a "weirdo."

182.     According to Defendant Narron, the detention officers thought Parker was "drunk."

183.     Mr. Parker was not drunk. He was in an acute manic state and experiencing a psychiatric emergency.

184.     At the time of his admission and throughout his detention, Mr. Parker had a serious medical/psychiatric condition and needed to receive a proper medical assessment and emergency medical care.

185.     Mr. Parker's mental health condition was so obvious that a detention officer, a licensed practical nurse, and lay people would have recognized that it required the attention of a doctor or treatment.

186.     If he had received emergency medical treatment, Mr. Parker's mental health condition would have been stabilized by a shot of Haldol (an antipsychotic medication) and/or Ativan (a sedative medication). Once his condition was stabilized, Mr. Parker would have received appropriate medications and monitoring for his mental health disorders.

187.     Despite Mr. Parker's serious medical needs, the detention officers misperceived him as a disruptive inmate or an intoxicated inmate beyond reasonable comprehension levels.

188.     In accordance with Defendant Sheriff Pierce's mental health screening policy, the Wayne County detention officers did not complete a mental health screening form for Mr. Parker.

189.     The Wayne County detention officers also did not complete a receiving officer's screening form or a medical screening form for Mr. Parker in violation of the Detention Center's Medical Plan and Detention Center General Order #03 (Medical Screening – Inmates).

190. Instead, Defendants Santagata and Narron, at the direction of Defendant Sparks, sprayed Mr. Parker in the face with Oleoresin-Capsicum (OC) spray several times, and Parker was dragged by the officers to the shower room.

191. The shower room was 5' 3" wide and 14' 4" long with a small narrow shower adjoining it. The shower room was accessed through an entry door from a hall that connected to the intake area. On the other side of the shower room, there was an exit door that led to a hallway with eight cells, including Cell #011.

192. In the shower room, Defendant Garner joined Defendant Sparks, Defendant Santagata, Defendant Narron, and Detention Officer Daughtry. The detention officers undressed Mr. Parker in the shower room before Parker lay down on the floor near the shower.

193. While Mr. Parker was on the ground, Defendant Narron sprayed him in the face with OC spray again, and Defendants Narron and Garner attempted to apply pressure point techniques.

194. The detention officers physically moved Mr. Parker into the shower and he lay on the floor face-down. The officers heard Mr. Parker saying, "I'm an American," "shoot me, shoot me," and other unintelligible things.

195. When Parker would not wash himself or stand up, the detention officers shot him with a water hose. According to Defendant Sparks, Mr. Parker defecated on himself in the shower and "laughed about it like he did not care."

196. Once they hosed him down, the detention officers rolled Mr. Parker onto a blanket and dragged him naked out of the shower area and down the hallway to Cell #011 for confinement in disciplinary segregation.

197. Cell #011 was a segregation cell. The cell was 6' wide and 7' deep. It had a hole in the floor that served as a toilet and nothing else. The detention officers referred to Cell #011 as the "hole."

**E.    Saturday, May 20, 2017 – Segregation Cell #011, Day Shift**

198. At approximately 12:25 p.m., Jerry Parker was placed in Cell #011 by Defendant Sparks, Defendant Narron, Defendant Santagata, Defendant Garner, and Detention Officer Daughtry.

199. Mr. Parker stood up in the cell and continued mumbling and talking to himself using unintelligible words.

200. Mr. Parker was naked and had nothing with him in Cell #011.

201. Defendant Driver observed the detention officers' interactions with Mr. Parker in the intake and shower areas, and she talked with Defendant Narron. Defendant Jane Driver saw Mr. Parker's unusual behavior and she was aware that the officers had sprayed him several times with OC spray.

202. Defendant Driver knew that the detention officers had not completed a receiving officer's screening form, medical screening form, or mental health screening form in connection with Mr. Parker's booking and admission to the Detention Center.

203. Upon information and belief, Defendant Driver's shift ended at 12:00 p.m. on May 20, 2017. She stayed past 12:00 p.m. at work because Mr. Parker had been admitted to the Detention Center and there were no health care providers scheduled to work after her shift ended.

204. At approximately 12:30 p.m., Defendant Driver went to Cell #011 after talking with Defendant Narron.

205.   Defendant Driver tried to speak with Mr. Parker but he was talking incoherently to himself and did not respond to her.

206.   Mr. Parker's mental health condition was so obvious that Defendant Driver was either aware or strongly suspected that he had a serious medical need.

207.   Despite her knowledge, Defendant Driver did not assess Mr. Parker's condition, did not contact a physician, nurse practitioner, registered nurse, or emergency medical services, and did not obtain any medical treatment for him.

208.   Defendant Driver did not complete a medical or mental health screening form for Mr. Parker and she did not create any records from her interactions with him.

209.   After she saw Mr. Parker in Cell #011, Defendant Driver left the Wayne County Detention Center. Once she left, there were no health care providers scheduled to work at the Detention Center for the rest of the weekend.

210.   Mr. Parker was held in disciplinary segregation in Cell #011 without any clothing through the end of the day shift at 7:00 p.m. According to the Detention Center records, Parker refused lunch and dinner.

211.   Before the end of the day shift, Defendants Sparks, Narron, Santagata, and Garner directly observed Mr. Parker several times each.[2] Mr. Parker was facing or leaning on the wall of the cell and mumbling unintelligible words to himself every time these Defendants checked on him.

---

[2] Defendant Sparks, the day shift Sergeant, failed to ensure that Mr. Parker was directly observed at least 4 times per hour and that segregation records were generated and maintained, in violation of Detention Center General Order #14 and 10A N.C. Admin. Code § 14J.0601.

30

212.    During the late afternoon, Mr. Parker turned around when Defendant Narron was walking by and said he wanted a "38 to shoot God." According to Narron, Parker meant a ".38 Special."

213.    Based on his observations, Defendant Narron determined that Mr. Parker was "drunk or mentally unstable."

214.    Defendants Sparks, Santagata, and Garner each reached similar conclusions that Parker was "drunk or mentally unstable."

215.    The detention officers were aware that Parker did not have access to and had not consumed any intoxicating substances since his arrest and admission to the Detention Center.

216.    While he was held in Cell #011 during the day shift, Mr. Parker was still in an acute manic state and his mental health condition deteriorated.

217.    Mr. Parker's mental health condition was so obvious that Defendants Sparks, Narron, Santagata, and Garner were either aware or strongly suspected that he had a serious medical need.

218.    In addition, Defendants Sparks, Narron, Santagata, and Garner knew that Defendant Driver and the other health care providers employed by Defendant Southern Health Partners were not providing any treatment to Mr. Parker.

219.    Despite their knowledge, Defendants Sparks, Narron, Santagata, and Garner did not contact a health care provider or emergency medical services to obtain medical attention and treatment for Mr. Parker during the day shift.

**F.      Saturday, May 20, 2017 – Segregation Cell #011, Night Shift**

220.     Near the end of the day shift, a briefing was held for the detention officers on the night shift - including Defendants Lee, Woodall, Arias, Hines, and Neal - and they were told that Parker was being held in disciplinary segregation.

221.     At the briefing, Defendant Narron informed Defendants Lee, Woodall, Arias, Hines, and Neal about Parker's mental health condition and behavior during the day shift, including his determination that Parker was "drunk or mentally unstable."

222.     From 7:00 through 9:00 p.m., Defendant Lee directly observed Mr. Parker several times.[3] On each occasion, Parker was staring out the small glass window on the door of Cell #011 and would not respond to Defendant Lee.

223.     During this period, Mr. Parker was still in an acute manic state and his mental condition further deteriorated.

224.     Around 9:00 p.m., Mr. Parker smeared feces throughout Cell #011. According to Defendant Lee, Parker was banging his hand and head on the glass window and acting erratic.

225.     Defendants Lee and Woodall went to Cell #011. When Mr. Parker would not respond to them, Defendants Lee and Woodall each sprayed Parker at least two times in the face with OC spray through the tray trap on the cell door.

226.     Defendant Lee called Defendants Arias, Hines, and Neal to Cell #011 due to Parker's abnormal behavior.

227.     At approximately 9:22 p.m., Defendants Lee, Woodall, Arias, Hines, and Neal met in a hallway between the intake and shower areas in preparation for dealing with Mr. Parker.

---

[3] Defendant Lee, the night shift Sergeant, also failed to ensure that Mr. Parker was directly observed at least 4 times per hour and that segregation records were generated and maintained.

228.    When these Defendants returned to Cell #011, Mr. Parker was banging and kicking the door. Parker alternated between mumbling incoherently and screaming gibberish.

229.    Defendants Hines and Neal each sprayed Parker at least one time in the face with OC spray.

230.    Defendant Lee pulled a hose to Cell #011 and sprayed Parker with hot water. Parker yelled that he was burning and lay on the cell floor on his stomach. Once this occurred, Defendant Lee turned off the hot water.

231.    Defendants Lee, Woodall, Arias, Hines, and Neal opened the cell door, handcuffed Parker behind his back, pulled him up, and escorted him down the hall to the shower area.

232.    Mr. Parker's mental health condition was so obvious that Defendants Lee, Woodall, Arias, Hines, and Neal were either aware or strongly suspected that Parker had a serious medical need during their interactions with him in Cell #011.

233.    Despite their knowledge, Defendants Lee, Woodall, Arias, Hines, and Neal did not contact emergency medical services or a health care provider to obtain treatment for Mr. Parker.

**F.    Saturday, May 20, 2017 – Attack on Parker in the Shower Room**

234.    At approximately 9:37 p.m., Defendants Lee, Woodall, Arias, Hines, and Neal took Jerry Parker to the shower and removed his handcuffs.

235.    While he was in the shower, Mr. Parker became upset for an unknown reason and he moved towards Defendants Woodall, Neal, and Lee.

236.    In response, Mr. Parker was punched, pushed backwards, and thrown to the floor near the closed exit door of the shower room by Defendants Woodall and Lee.

237. Defendant Trooper Grainger was present at the Wayne County Detention Center in the intake area with an arrestee. When he heard the commotion, Defendant Grainger opened the entry door to the shower room and watched the detention officers and Mr. Parker.

238. At all times after he was thrown to the floor, Mr. Parker did not pose a threat to any of the detention officers or the trooper, he did not actively resist them, and he was not a security problem.

239. At approximately 9:40 p.m., while Parker was on the floor, Defendants Lee, Woodall, Arias, Hines, and Neal kicked, stomped, and punched Mr. Parker numerous times all over his body and head. When the other officers stopped attacking Parker, Defendant Woodall violently kicked him a final time while he was cowering on the floor.

240. After the initial attack, Mr. Parker was dazed, breathless, and seated naked on the floor near the exit door with blood flowing down his head. The detention officers walked away from him through the entry door and into the adjoining hall with Defendant Grainger.

241. Mr. Parker had physical injuries from the initial attack. He was continuing to breathe laboriously and to talk incoherently.

242. Mr. Parker's medical and mental health conditions were so obvious that Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger knew Parker had serious medical needs. These Defendants still did not contact emergency medical services or a health care provider to obtain treatment for Mr. Parker.

243. At approximately 9:42 p.m., after more than a minute had elapsed, Defendants Lee, Woodall, Arias, Hines, and Neal re-entered the shower room. These Defendants had OC spray and handcuffs with them, and Defendant Lee was carrying a Nova electronic stun shield, a conductive electrical weapon (CEW).

244.     Defendants Lee and Woodall were wearing surgical masks that covered their nose and mouth. They approached Mr. Parker, sprayed him with OC spray several times, and forced him onto his stomach.

245.     Defendant Lee placed the Nova stun shield on Parker's back, shocked him, and applied pressure. Defendant Woodall kicked him in the side and stomped on Parker's body.

246.     Defendant Lee ordered the other detention officers to obtain leg shackles and a hobble restraint. The detention officers intended to hog-tie Mr. Parker in a prone position by handcuffing his arms and shackling his legs behind his back, and connecting the handcuffs and shackles with the hobble restraint.

247.     While Defendant Lee was applying the stun shield, Defendant Woodall applied pressure to Parker's back with his leg. Defendants Arias and Hines approached Parker and pulled his legs behind his back to shackle him.

248.     Defendant Woodall continued to kick Mr. Parker and punched him multiple times in the head, face, and right eye with a closed fist.

249.     Mr. Parker was held on the ground face-down with Defendants Woodall, Lee, Arias, and Hines applying pressure to his back with the stun shield and their weight. One or more of these Defendants kicked and punched Parker while he was on the ground.

250.     Defendant Grainger watched the detention officers attack Mr. Parker through the open entry door but he did not intervene to stop them and did not encourage them to get medical attention for Parker.

251.     At approximately 9:43 p.m., Defendant Grainger entered the shower room, approached the detention officers, and began to assist them with their efforts to hog-tie Mr. Parker.

252. Mr. Parker had his hands underneath his chest in order to breathe while the officers were applying pressure to his back. The detention officers pulled his arms back, Defendant Neal applied a handcuff to one of Parker's wrists, and Trooper Grainger tightened the cuff.

253. Mr. Parker was screaming while the officers held him down. As the detention officers tried to apply the second handcuff, Parker pulled his arm back in an effort to breathe. In response, Defendants Lee, Woodall, and Arias threw Parker to the right and left on the floor and into the wall. They kicked, stomped, punched, and kneed him all over his body.

254. Mr. Parker was restrained by the detention officers in the corner of the shower room face down and bleeding with his head pushed into the wall. Defendant Arias took the Nova electronic shield from Defendant Lee and applied pressure to Parker's back. Defendants Woodall and Hines held Parker's shackled legs and forced them up behind his back in a hog-tie position.

255. Trooper Grainger was standing near the detention officers and he told them to "knock him out."

256. Defendant Lee left the shower room through the entry door and obtained a Taser X26 electronic stun gun.

257. While Mr. Parker was restrained by Defendants Arias, Woodall, and Hines, Defendant Lee shocked Parker with the Taser X26 in drive stun mode at least three times within a span of 70 seconds.

258. When the Taser X26 applications did not knock Mr. Parker out, Defendants Lee, Arias, Woodall, and Hines punched Parker with closed fists multiple times in the head, body, abdomen, arms, and legs. In addition, Defendant Woodall applied a chokehold around Parker's neck.

259. During the next few minutes, Defendants Lee, Arias (using the Nova CEW shield), Woodall, Hines, and Neal were on top of Mr. Parker holding him down on his stomach, and attempting to finish their efforts to hog-tie Parker.

260. In connection with restraining Mr. Parker, Defendant Woodall used his weight to push down on Parker's chest or neck with his leg.

261. Defendant Grainger closely watched the detention officers and, at times, assisted them with restraining Parker on the floor.

262. Defendant Grainger told the detention officers to use various pressure point techniques in order to complete the handcuffing and hog-tie, but the officers did not know how to properly apply them.

263. While the officers were restraining Mr. Parker, Defendant Grainger shocked Parker with a Taser X2 stun gun in drive stun mode twice on his right thigh and/or buttocks. The first Taser application lasted 13 seconds and the second one lasted 4 seconds.

264. The Taser applications did not knock Mr. Parker out and he was struggling to breathe. After approximately two minutes, Defendant Grainger yelled for the detention officers to stop.

265. Defendant Grainger shocked Mr. Parker with the Taser X2 in dart mode by shooting an initial set of electric barbs into his left abdomen.

266. Three seconds later, Defendant Grainger shocked Mr. Parker again with the Taser X2 by shooting a second set of electric barbs into the left side of his lower chest.

267. The second set of electric barbs incapacitated Parker. Defendant Lee finished handcuffing Mr. Parker behind his back, applied the hobble restraint, and hog-tied Parker on his stomach in the presence of Defendants Grainger, Woodall, Hines, Neal, and Arias.

268. The total time from the point when Mr. Parker entered the shower room until the point when he was hog-tied lasted approximately 15 minutes.

269. Defendants Arias, Lee, Woodall, Neal, and Hines left Mr. Parker in the shower room with Defendant Grainger. Mr. Parker was lying naked on the floor near the exit door, unconscious, hog-tied, with blood all over him and the area around him.

270. Defendant Grainger checked on Mr. Parker a couple times. After several minutes, Defendant Grainger noticed that Parker was turning blue and not breathing.

271. Defendant Grainger told the detention officers to get medical attention for Parker but no health care providers were present at the Detention Center.

272. Defendant Lee called Wayne County Office of Emergency Services, informed the dispatcher that they had a prisoner in custody (Code 10-72) who was a mental subject (Code 10-73), and requested medical assistance.

273. Wayne County EMS was dispatched to the Detention Center. When they entered the shower room, the EMTs were affected by the OC spray in the air.

274. The EMTs found Mr. Parker in cardiac arrest, unresponsive, and without a pulse. Parker was hog-tied with the handcuffs and leg shackles hooked together behind his back.

275. The EMTs asked the detention officers to remove the restraints but the officers refused. The EMTs performed CPR on Mr. Parker in the shower room while he was still hog-tied.

276. The hobble restraint was not removed until Mr. Parker was placed on a backboard for transport to the ambulance.

277. Wayne County EMS transported Mr. Parker in handcuffs, behind his back, and leg shackles from the Detention Center to Wayne Memorial Hospital in Goldsboro, which was 3 miles and less than 10 minutes away.

38

278.    Mr. Parker's heart was resuscitated and lost two times while he was in the care of the Wayne County EMTs.

279.    Mr. Parker went into sudden cardiac arrest because of the blunt force trauma, physical restraints, OC spray, CEW applications, and positional asphyxia while being held in a prone position by Defendants Lee, Woodall, Hines, Arias, Neal, and Grainger.

## G.    Jerry Parker's Death

280.    At 10:32 p.m. on May 20, 2017, Mr. Parker was admitted to the Emergency Department at Wayne Memorial Hospital. Mr. Parker was in asystole cardiac arrest upon arrival. After his heart was resuscitated a third time in the Emergency Room, he was transferred to the Intensive Care Unit. At the request of medical staff, the handcuffs and leg shackles were finally removed by the detention officers at the Hospital.

281.    Mr. Parker had numerous physical injuries, including diffuse cerebral edema (brain swelling) with some subarachnoid blood, right frontal scalp hematoma, multiple scalp abrasions and lacerations, right orbital fracture, right periorbital hematoma, nasal fracture, right maxillary sinus fracture, thyroid cartilage fracture with hemorrhages in the neck, left chest wall contusion, liver lacerations with associated hematoma, ligature marks on both ankles and wrists, and multiple areas of abrasions and bruising throughout his body.

282.    Two Taser barbs were removed from Mr. Parker's body at Wayne Memorial Hospital. CEW injuries were also noted on Parker's buttocks, chin/neck, and back.

283.    Although his heart was successfully resuscitated, Mr. Parker had severe traumatic brain injury and anoxic encephalopathy (loss of oxygen to the brain). Mr. Parker never regained consciousness.

284.	At 2:35 p.m. on May 21, 2017, Mr. Parker was pronounced dead at Wayne Memorial Hospital.

285.	If Defendants had obtained appropriate medical attention and treatment for Mr. Parker's mental health condition, Mr. Parker's acute manic state would have been stabilized and he would be alive.

**FIRST CLAIM FOR RELIEF:**
**DELIBERATE INDIFFERENCE**
**TO SERIOUS MEDICAL NEEDS**
**BY INDIVIDUAL DEFENDANTS**

286.	The allegations set forth in the preceding paragraphs are incorporated herein by reference.

287.	On May 20, 2017, Jerry Parker was a pretrial detainee while he was in the custody of the Wayne County Sheriff's Office.

288.	As a pretrial detainee at the Wayne County Detention Center, Mr. Parker was entitled to necessary medical attention and had a substantive due process right under the Fourteenth Amendment to be free from deliberate indifference to his serious medical needs. *See Gordon v. Kidd*, 971 F.2d 1087 (4th Cir. 1992).

289.	At the time of his admission and throughout his detention at the Wayne County Detention Center, Mr. Parker was in an acute manic state and experiencing a psychiatric emergency.

290.	Mr. Parker's mental state deteriorated while he was at the Wayne County Detention Center due to the lack of medical care, the conditions of his confinement, and the detention officers' multiple uses of force against him.

291.	Mr. Parker's mental health condition in the Detention Center was so obvious that even a lay person would have easily recognized the need for medical attention or treatment.

292.    After the initial attack by the detention officers in the shower area, Mr. Parker had physical injuries that were so obvious that even a lay person would have easily recognized the need for medical attention or treatment.

293.    Mr. Parker had serious medical needs while he was in the custody of the Wayne County Detention Center.

## A.    Defendant Christina M. Driver, LPN

294.    Between 12:00 p.m. and 12:30 p.m. on May 20, 2017, Defendant Driver directly observed Mr. Parker in the intake and shower areas at the Detention Center, and talked with Defendant Narron about him.

295.    At approximately 12:30 p.m., Defendant Driver saw Mr. Parker in Cell #011 for the purpose of providing nursing care.

296.    Defendant Driver was aware or strongly suspected that Mr. Parker had a serious medical need.

297.    Defendant Driver knew that Mr. Parker's mental health condition required medical attention and that substantial risks of serious harm existed to Mr. Parker if his condition was not treated.

298.    Defendant Driver consciously disregarded the substantial risks of serious harm to Mr. Parker by not assessing his condition, not contacting a physician, nurse practitioner, registered nurse, or emergency medical services, and not obtaining any medical treatment for him.

299.    After she saw Mr. Parker, Defendant Driver left the Wayne County Detention Center. When she left, Defendant Driver knew that there would be no health care providers at the Detention Center for the rest of the weekend.

300. The nursing care provided by Defendant Driver was a gross violation of the accepted standards of practice and so grossly incompetent and inadequate as to shock the conscience and be intolerable to fundamental fairness.

301. Defendant Driver was acting under color of state law when she provided nursing care to Mr. Parker.

302. Defendant Driver acted with deliberate indifference to the serious medical needs of Mr. Parker.

303. Defendant Driver is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Parker's substantive due process rights.

**B.      Defendants Sparks, Narron, Santagata, and Garner**

304. After Defendant Driver saw Mr. Parker at 12:30 p.m. and left the Detention Center, Defendants Sparks, Narron, Santagata, and Garner directly observed Mr. Parker in Cell #011 during the remainder of the day shift. These Defendants had also interacted with Mr. Parker before he was seen by Defendant Driver.

305. Based on their observations, Defendants Sparks, Narron, Santagata, and Garner recognized that Mr. Parker was mentally unstable and that he was exhibiting symptoms of mental illness.

306. Defendants Sparks, Narron, Santagata, and Garner were each aware or strongly suspected that Mr. Parker had a serious medical need.

307. Defendants Sparks, Narron, Santagata, and Garner knew that Mr. Parker's mental health condition required medical attention and that substantial risks of serious harm existed to Mr. Parker if his condition was not treated.

308.     Defendants Sparks, Narron, Santagata, and Garner knew that Defendant Driver had not contacted a health care provider and had not obtained any treatment for Mr. Parker, and that no health care providers were providing treatment to Mr. Parker.

309.     Defendants Sparks, Narron, Santagata, and Garner each consciously disregarded the substantial risks of serious harm to Mr. Parker by not contacting a health care provider or emergency medical services to provide medical attention and treatment for him.

310.     Defendants Sparks, Narron, Santagata, and Garner were acting under color of state law during their interactions with Mr. Parker.

311.     Defendant Sparks, Narron, Santagata, and Garner each acted with deliberate indifference to the serious medical needs of Mr. Parker.

312.     Defendants Sparks, Narron, Santagata, and Garner are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Parker's substantive due process rights.

**C.     Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger**

313.     Before the night shift began, Defendants Lee, Woodall, Arias, Hines, and Neal were informed about Mr. Parker's mental health condition and behavior during the day shift.

314.     From 7:00 p.m. through 9:00 p.m., Defendant Lee directly observed Mr. Parker several times in Cell #011.

315.     Between 9:00 p.m. and 9:37 p.m., Defendants Lee, Woodall, Arias, Hines, and Neal directly observed and interacted with Mr. Parker in Cell #011.

316.     After 9:37 p.m., Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger directly observed and interacted with Mr. Parker in the shower room.

317.   Based on their observations, Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger recognized that Mr. Parker was mentally unstable and that he was exhibiting symptoms of mental illness.

318.   These Defendants also knew that Mr. Parker was physically injured after the initial attack and during the subsequent attacks upon him in the shower room.

319.   Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger were each aware or strongly suspected that Mr. Parker had serious medical needs.

320.   Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger knew that Mr. Parker's mental health condition required medical attention and that substantial risks of serious harm existed to Mr. Parker if his condition was not treated.

321.   These Defendants also knew that his physical injuries required medical attention and that substantial risks of serious harm existed to Mr. Parker if his condition was not treated.

322.   Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger each consciously disregarded the substantial risks of serious harm to Mr. Parker by not contacting a health care provider or emergency medical services to provide medical attention and treatment for him.

323.   Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger were acting under color of state law during their interactions with Mr. Parker.

324.   Defendant Lee, Woodall, Arias, Hines, Neal, and Grainger each acted with deliberate indifference to the serious medical needs of Mr. Parker.

325.   Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Parker's substantive due process rights.

## SECOND CLAIM FOR RELIEF:
## EXCESSIVE FORCE BY DEFENDANTS
## LEE, WOODALL, ARIAS, HINES, NEAL, AND GRAINGER

326.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

327.    As a pretrial detainee at the Wayne County Detention Center, Jerry Parker had a due process right under the Fourteenth Amendment to be free from the use of excessive force during his confinement. *See Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015).

328.    Beginning at approximately 9:40 p.m. on May 20, 2017, Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger deliberately used force against Mr. Parker in the shower room at the Detention Center that was unreasonable under the totality of circumstances.

329.    The unreasonable force used by Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger against Mr. Parker included (at least):

   a.    Defendant Lee, Woodall, Arias, Hines, and Neal kicked, stomped, and punched Mr. Parker numerous times all over his body and head after he was initially thrown to the floor;

   b.    Defendant Woodall violently kicked Mr. Parker on the side of his body while he was subdued on the floor;

   c.    Defendants Lee and Woodall sprayed Mr. Parker with OC spray several times and forced him onto his stomach;

   d.    Defendant Lee used a Nova stun shield to shock Mr. Parker;

   e.    Defendant Woodall kicked Parker in the side and stomped on his body while Defendant Lee was holding Mr. Parker down with the Nova stun shield;

   f.    Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger attempted to hog-tie Mr. Parker behind his back with handcuffs, leg shackles, and a hobble restraint;

   g.    Defendants Lee and Arias used the Nova stun shield and Defendants Woodall, Arias, Hines, Neal, and Grainger used their body weight and legs to apply significant pressure on Mr. Parker's back for extended periods of time while Parker was physically injured, prone, and being forced into a hog-tie position;

45

h. Defendant Woodall kicked and punched Mr. Parker multiple times in the head, face, and right eye with a closed fist while the officers were attempting to hog-tie Mr. Parker in a prone position;

i. Defendants Woodall, Lee, Arias, and/or Hines kicked and punched Mr. Parker on the ground while he was being held down face-down by the officers;

j. In response to Mr. Parker's attempts to breathe, Defendants Lee, Woodall, and Arias threw Parker to the right and left on the floor and into the wall, and kicked, stomped, punched, and kneed him all over his body;

k. Defendant Lee shocked Mr. Parker with a Taser X26 in drive-stun mode at least three times while he was restrained by the other officers;

l. Defendants Lee, Arias, Woodall, and Hines punched Mr. Parker with closed fists multiple times in the head, body, abdomen, arms, and legs after he had been shocked with the Taser X26;

m. Defendant Woodall applied a chokehold around Mr. Parker's neck;

n. Defendant Grainger shocked Mr. Parker with a Taser X2 in drive-stun mode two times after Parker had been subjected to extensive uses of force and while restrained; and,

o. Defendant Grainger shocked Mr. Parker with a Taser X2 stun gun in dart mode by shooting two sets of electric barbs into Parker.

330. The amount of force used by Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger was substantial, administered over a prolonged time period, and resulted in Mr. Parker's death.

331. Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger did not make any efforts to limit or to temper the amount of force used on Mr. Parker.

332. After he was thrown to the floor in the shower room, Mr. Parker did not pose a threat to anyone and he did not actively resist Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger.

333. Mr. Parker was not a security problem in the shower room once he was thrown to the floor.

334.     Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger used excessive force against Mr. Parker.

335.     Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger were integral or fully active participants in the acts of excessive force committed by each Defendant.

336.     In addition to their individual acts of excessive force, Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger are liable for all excessive force used on Mr. Parker in the shower room under the Integral Participation Doctrine. *See Boyd v. Benton County*, 374 F.3d 773 (9th Cir. 2004).

337.     Defendants Grainger and Neal knew that Defendants Lee, Woodall, Arias, and/or Hines were using excessive force against Mr. Parker.

338.     Defendants Grainger and Neal each had a duty to intervene and a reasonable opportunity to stop the use of excessive force by one or more of the other Defendants but chose not to act.

339.     Defendants Grainger and Neal have bystander liability for the excessive force used by Defendants Lee, Woodall, Arias, and Hines.

340.     Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Parker's due process rights.

## THIRD CLAIM FOR RELIEF:
### POLICY OR CUSTOM OF DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS BY DEFENDANTS WAYNE COUNTY, SHERIFF PIERCE, AND SOUTHERN HEALTH PARTNERS

341.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

342. From September 1, 2014 through May 20, 2017, Defendant Wayne County contracted with Defendant Southern Health Partners to provide all medical and mental health services to prisoners at the Wayne County Detention Center.

343. In February 2016, Defendant Wayne County reviewed and approved a Medical Plan for the Detention Center in consultation with Defendants Sheriff Pierce and Southern Health Partners.

344. On and before May 20, 2017, Defendants Wayne County, Sheriff Pierce, and Southern Health Partners knew that:

a. A significant number of prisoners at the Wayne County Detention Center had serious mental health needs that required appropriate medical attention and/or treatment;

b. Defendant Southern Health Partners did not employ any mental health providers at the Wayne County Detention Center and no mental health care or treatment was available for prisoners;

c. Defendant Southern Health Partners had a single LPN present at the Detention Center without any on-site medical supervision from 8:00 a.m. until 12:00 p.m. Monday-Saturday (excluding holidays);

d. The LPNs employed by Defendant Southern Health Partners had inadequate supervision, training and experience to properly assess, monitor, and obtain treatment for prisoners with serious mental health needs;

e. The responsible physician employed by Defendant Southern Health Partners, Dr. Chanson DeVaul, was only available once per week at the Wayne County Detention Center and his practice was more than 25 miles away;

f. The Sheriff's mental health screening policy was inconsistent with the Medical Plan at the Detention Center and prisoners with serious mental health needs who were perceived as "disruptive" or "intoxicated beyond reasonable comprehension levels" would not receive a mental health screening before confinement; and,

g. Prisoners with serious mental health needs were placed and held in segregation cells at the Wayne County Detention Center for extended periods of time without an adequate assessment or monitoring by a qualified medical or mental health provider.

## A. Defendant Wayne County

345. Defendant Wayne County's Medical Plan and contract with Defendant Southern Health Partners failed to provide adequate medical care, mental health care, medical supervision, and emergency medical care for prisoners with mental health disorders at the Detention Center.

346. Through its inadequate Medical Plan and contractual relationship with Southern Health Partners, Defendant Wayne County had an official policy or custom of deliberate indifference to the serious medical needs of prisoners, like Jerry Parker, with mental health disorders at the Wayne County Detention Center.

347. Defendant Wayne County's official policy or custom was a cause of, and the moving force behind, the violation of Mr. Parker's rights to be free from deliberate indifference to his serious medical needs.

348. Defendant Wayne County is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policy or custom which caused Mr. Parker's substantive due process rights to be violated at the Wayne County Detention Center.

## B. Defendant Sheriff Pierce

349. On and before May 20, 2017, Defendant Sheriff Pierce also knew that:

    a. In-service mental health training was needed for the detention officers at the Wayne County Detention Center due to the number of prisoners with mental health issues who were admitted at the Detention Center;

    b. No in-service training was provided to the detention officers at the Detention Center on mental health screening, assessing and identifying prisoners with mental health problems, handling prisoners with mental health issues, mental health crisis intervention, or the use of force on mentally ill prisoners;

    c. The detention officers at the Wayne County Detention Center were following the Sheriff's mental health screening policy in Detention Center General Order #03 rather than the Medical Plan and were not completing a mental health screening for mentally ill prisoners who were perceived as "disruptive" or "intoxicated beyond reasonable comprehension levels;"

49

d. Prisoners with serious medical mental health needs who were perceived as "disruptive" or "intoxicated beyond reasonable comprehension levels" were being subjected to OC spray and/or physical harm from the detention officers instead of receiving medical attention and care;

e. The Sheriff's Office had inadequate written policies at the Detention Center for prisoners with mental health needs; and,

f. Detention officers had failed to obtain treatment for mentally ill prisoners at the Detention Center with serious medical needs on other occasions and used force when the prisoners' mental health conditions deteriorated in custody.

350. Defendant Sheriff Pierce failed to provide adequate training to detention officers at the Wayne County Detention Center on screening, assessing, identifying, and handling prisoners with mental health disorders.

351. Defendant Sheriff Pierce knew that the detention officers would confront prisoners with serious mental health needs and, without adequate mental health training and policies, these prisoners would frequently not receive proper medical attention and care in violation of their due process rights.

352. Defendant Sheriff Pierce's failure to provide adequate mental health training to the detention officers at the Wayne County Detention Center showed a deliberate indifference to the rights of citizens, including Jerry Parker.

353. Defendant Sheriff Pierce had an official policy or custom of deliberate indifference to the serious medical needs of prisoners, like Mr. Parker, with mental health disorders.

354. Defendants Sparks, Narron, Santagata, and Garner acted in accordance with the Sheriff's policy or custom through their deliberate indifference to the serious medical needs of Mr. Parker during the day shift on May 20, 2017.

50

355.     Defendants Lee, Woodall, Arias, Hines, and Neal acted in accordance with the Sheriff's policy or custom through their deliberate indifference to the serious medical needs of Mr. Parker during the night shift on May 20, 2017.

356.     Defendant Sheriff Pierce's official policy or custom was a cause of, and the moving force behind, the violation of Mr. Parker's rights to be free from deliberate indifference to his serious medical needs.

357.     Defendant Sheriff Pierce is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policy or custom which caused Mr. Parker's substantive due process rights to be violated at the Wayne County Detention Center.

## C.     Defendant Southern Health Partners

358.     From September 1, 2014 through May 20, 2017, Defendant Southern Health Partners failed to provide adequate medical and mental health staffing at the Wayne County Detention Center, failed to provide adequate mental health training for its nursing staff and the detention officers, and failed to provide adequate supervision for its nursing staff.

359.     Defendant Southern Health Partners knew that the nursing staff and detention officers at the Detention Center would confront prisoners with serious mental health needs and, without adequate staffing, mental health training, and supervision, these prisoners would frequently not receive proper medical attention and care in violation of their due process rights.

360.     Defendant Southern Health Partner's failure to provide adequate staffing at the Wayne County Detention Center, mental health training for the nursing staff and detention officers, and supervision of the nursing staff showed a deliberate indifference to the rights of citizens, including Jerry Parker.

361.    Defendant Southern Health Partners provided inadequate staffing, training, and supervision in order to make a substantial profit at an "affordable" cost for Defendant Wayne County.

362.    Defendant Southern Health Partners had an official policy or custom of deliberate indifference to the serious medical needs of prisoners, like Mr. Parker, with mental health disorders.

363.    Defendant Driver acted in accordance with Defendant Southern Health Partners' policy or custom through her deliberate indifference to the serious medical needs of Mr. Parker.

364.    Defendant Southern Health Partners' official policy or custom was a cause of, and the moving force behind, the violation of Mr. Parker's rights to be free from deliberate indifference to his serious medical needs.

365.    Defendant Southern Health Partners is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policy or custom which caused Mr. Parker's substantive due process rights to be violated at the Wayne County Detention Center.

### **Alternative Claim for *Respondeat Superior* Liability**

366.    At all times relevant to this action, Defendant Driver was employed by Defendant Southern Health Partners.

367.    Defendant Driver acted within the course and scope of her employment with Defendant Southern Health Partners while providing nursing care to Mr. Parker at the Wayne County Detention Center.

368.    Defendant Southern Health Partners is vicariously liable for Defendant Driver's deliberate indifference to the serious medical needs of Mr. Parker at the Detention Center.

52

369. In the alternative to an official policy or custom, Defendant Southern Health Partners is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Parker's substantive due process rights by Defendant Driver under the doctrine of *Respondeat Superior.*

**FOURTH CLAIM FOR RELIEF:**
**POLICY OR CUSTOM OF DELIBERATE INDIFFERENCE**
**TO THE INADEQUATE TRAINING OF DETENTION OFFICERS**
**ON THE RISKS OF POSITIONAL ASPHYXIA**
**BY DEFENDANT SHERIFF PIERCE**

370. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

371. On and before May 20, 2017, Defendant Sheriff Pierce knew that detention officers at the Wayne County Detention Center frequently restrained prisoners in a prone position, including with a hog-tie, after the use of OC spray, conductive electrical weapons, and/or physical force.

372. Defendant Sheriff Pierce knew that risks of positional asphyxia existed when a prisoner was restrained face-down in a prone position, especially when the prisoner was physically large or obese, had a restricted or impeded airway, had been subjected to OC spray and/or a CEW application, was under the influence of alcohol or an intoxicating substance, and/or was in a state of agitated or excited delirium.

373. Defendant Sheriff Pierce did not have any policies at the Wayne County Detention Center addressing positional asphyxia and did not have a policy prohibiting the restraint of a prisoner in a hog-tie position.

374. Defendant Sheriff Pierce failed to provide adequate training to the detention officers at the Detention Center on the risks of positional asphyxia during the prone restraint of a prisoner.

53

375. Defendant Sheriff Pierce knew that the detention officers would restrain prisoners who were at risk of positional asphyxia in a prone position and, without adequate training and policies, these prisoners would be exposed to serious harm, including sudden death.

376. Defendant Sheriff Pierce's failure to provide adequate training on the risks of positional asphyxia to the detention officers at the Wayne County Detention Center showed a deliberate indifference to the rights of citizens, including Jerry Parker.

377. Defendant Sheriff Pierce had an official policy or custom of deliberate indifference to the inadequate training of detention officers on the risks of positional asphyxia while restraining a prisoner, like Mr. Parker, in a prone position.

378. Defendants Lee, Woodall, Arias, Hines, and Neal acted in accordance with the Sheriff's policy or custom of inadequate training when they held Mr. Parker in a prone position and attempted to hog-tie him in the shower room on May 20, 2017.

379. Defendant Sheriff Pierce's official policy or custom was a cause of, and the moving force behind, the violation of Mr. Parker's rights to be free from excessive force.

380. Defendant Sheriff Pierce is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policy or custom which caused Mr. Parker's due process rights to be violated at the Wayne County Detention Center.

**FIFTH CLAIM FOR RELIEF:**
**ACTION ON OFFICIAL BOND AGAINST**
**DEFENDANTS SHERIFF PIERCE AND WESTERN SURETY**

381. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

382. On February 5, 2017, Defendant Sheriff Pierce procured an official bond as principal from Defendant Western Surety Company in the sum of $25,000 for a one-year period.

383.     Defendant Western Surety Company joined with Defendant Pierce as surety in the execution of the official bond and thereby undertook to be jointly and severally liable for the failure of Defendant Sheriff Pierce and his employees to faithfully perform the duties of his office as Sheriff of Wayne County.

384.     Defendant Sheriff Pierce's official bond was in full force and effect on May 20, 2017.

385.     Defendants Sparks, Narron, Santagata, and Garner were acting within the course and scope of their employment as Wayne County detention officers and under color of Sheriff Pierce's office during their interactions with Mr. Parker on May 20, 2017.

386.     The acts and omissions of Defendants Sparks, Narron, Santagata, and Garner, as alleged in this action and imputed to Defendant Sheriff Pierce, constituted neglect, misconduct, misbehavior, and/or a breach of their official duties as detention officers.

387.     Defendants Lee, Woodall, Arias, Hines, and Neal were acting within the course and scope of their employment as Wayne County detention officers and under color of Sheriff Pierce's office during their interactions with Mr. Parker on May 20, 2017.

388.     The acts and omissions of Defendants Lee, Woodall, Arias, Hines, and Neal, as alleged in this action and imputed to Defendant Sheriff Pierce under the doctrine of *Respondeat Superior*, constituted neglect, misconduct, misbehavior, and/or a breach of their official duties as detention officers.

389.     Defendants Sheriff Pierce and Western Surety are liable to Plaintiff, pursuant to N.C. Gen. Stat. § 58-76-5, for the unlawful acts and omissions committed by the Wayne County detention officers against Mr. Parker under color of the Sheriff's office.

## SIXTH CLAIM FOR RELIEF:
## MEDICAL MALPRACTICE BY DEFENDANTS
## SOUTHERN HEALTH PARTNERS AND DRIVER

390.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

391.    During her care of Jerry Parker, Defendant Driver owed Mr. Parker a duty to use her best judgment, to use reasonable care and diligence in the application of her knowledge and skill to Mr. Parker's care, and to provide health care in accordance with the standards of practice among licensed practical nurses with similar training and experience in the same or similar communities.

392.    Before she provided nursing care to Mr. Parker, Defendant Driver had observed Parker in the intake and shower areas, talked with Defendant Narron about him, and knew that the officers had not completed a screening form, medical screening form, or mental health screening form for him.

393.    When she personally interacted with Mr. Parker, Defendant Driver knew that Parker had been sprayed several times with OC spray and was exhibiting abnormal behavior indicative of a serious mental health condition. Defendant Driver also knew that once she left the Detention Center, there were no health care providers scheduled to work for the remainder of the week.

394.    At a minimum, Defendant Driver was negligent and breached her duty of care to Mr. Parker by failing to use her best judgment, failing to use reasonable care and diligence in the application of her knowledge and skill to Mr. Parker's care, and failing to provide health care in accordance with the standards of practice among licensed practical nurses (or registered nurses, if

applicable) with similar training and experience in the same or similar communities, in one or more of the following ways:

    a.  By not assessing his condition;

    b.  By not contacting a physician, nurse practitioner, registered nurse, or emergency medical services;

    c.  By not obtaining any medical treatment for him; and,

    d.  In such further ways as may be shown by the evidence.

395.    Defendant Driver was grossly negligent in her care and treatment of Mr. Parker because her actions: (a) lacked even slight care, (b) showed indifference to the rights and welfare of his person, (c) were of an aggravated character, (d) were committed in reckless disregard for the rights and safety of Mr. Parker, and (e) intentionally failed to comply with her duties as a licensed practical nurse.

396.    Defendant Driver was employed by Defendant Southern Health Partners and acting within the course and scope of her employment when she provided nursing care to Mr. Parker at the Wayne County Detention Center.

397.    Defendant Southern Health Partners is vicariously liable to Plaintiff, pursuant to the doctrine of *Respondeat Superior*, for the medical malpractice by Defendant Driver.

## DAMAGES

398.    As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, and excessive force, Jerry Parker suffered severe personal injuries throughout his confinement at the Wayne County Detention Center from the deterioration of his mental health, extensive use of OC spray, hot water, physical attacks on him (kicks, stomps, punches, knee strikes, and chokehold), multiple CEW applications, hog-tie efforts, and prolonged asphyxiation.

399.     Mr. Parker's physical injuries included severe traumatic brain injuries, right frontal scalp hematoma, right orbital fracture, right periorbital hematoma, nasal fracture, right maxillary sinus fracture, thyroid cartilage fracture with hemorrhages in the neck, left chest wall contusion, liver lacerations with associated hematoma, ligature marks on both ankles and wrists, and multiple areas of abrasions, lacerations, and bruising throughout his head and body.

400.     Due to his personal injuries, Mr. Parker experienced substantial physical pain, mental suffering, and mental anguish.

401.     Mr. Parker also experienced disability, handicap, inconvenience, and hardship from the loss of use of his body and mind due to his physical injuries and the deterioration of his mental condition.

402.     Plaintiff, as the Administrator of the Estate of Graydon Jerome Parker, III, is entitled to recover compensatory damages from Defendants, jointly and severally, for Mr. Parker's personal injuries under N.C. Gen. Stat. § 28A-18-1.

403.     As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, and excessive force, Mr. Parker suffered sudden cardiac arrest and anoxic encephalopathy which caused his death on May 21, 2017.

404.     Mr. Parker would be alive if Defendants had obtained appropriate medical attention and treatment for his serious mental health needs.

405.     Mr. Parker was 54 years old at the time of his death.

406.     Mr. Parker was survived by his mother, Plaintiff Margaret Jean Kelly, who is his sole heir under the North Carolina Intestate Succession Act, N.C. Gen. Stat. § 29-1, *et seq.*

407.    As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, and excessive force, Plaintiff, as the Administrator of the Estate of Graydon Jerome Parker, III, is entitled to recover the following damages under N.C. Gen. Stat. § 28A-18-2(b):

    a.  Expenses for the care, treatment, and hospitalization of Mr. Parker incident to the injury resulting in his death;

    b.  Compensation for the pain and suffering of Mr. Parker;

    c.  The reasonable funeral expenses of Mr. Parker;

    d.  The present monetary value of Mr. Parker to his mother of the reasonably expected:

        i.  Services, protection, care, and assistance of Mr. Parker, whether voluntary or obligatory, to his mother; and,

        ii.  Society, companionship, comfort, guidance, kindly offices, and advice of Mr. Parker to his mother.

408.    Plaintiff, as the Administrator of the Estate of Graydon Jerome Parker, III, is entitled to recover compensatory damages from Defendants, jointly and severally, for Mr. Parker's wrongful death under N.C. Gen. Stat. § 28A-18-2.

409.    The acts of deliberate indifference to Mr. Parker's serious medical needs by Defendants Driver, Southern Health Partners, Sparks, Narron, Santagata, Garner, Lee, Woodall, Arias, Hines, Neal, and Grainger, as alleged above, were done with reckless or callous indifference to Mr. Parker's civil rights.

410.    The acts of excessive force by Defendants Lee, Woodall, Arias, Hines, Neal, and Grainger, as alleged above, were done with reckless or callous indifference to Mr. Parker's civil rights.

411.    Plaintiff is entitled to recover punitive damages from Defendants Driver, Southern Health Partners, Sparks, Narron, Santagata, Garner, Lee, Woodall, Arias, Hines, Neal, and Grainger under 42 U.S.C. § 1983.

412. The acts of medical malpractice by Defendant Driver, as alleged above, were done with conscious and intentional disregard of an indifference to the rights and safety of others, including Mr. Parker, which she knew or should have known was reasonably likely to result in injury, damage, or other harm, including death.

413. The medical malpractice committed by Defendant Driver was willful or wanton conduct as defined in N.C. Gen. Stat. § 1D-5.

414. The officers, directors, or managers of Defendant Southern Health Partners condoned the willful or wanton conduct by Defendant Driver.

415. Plaintiff is entitled to recover punitive damages from Defendants Driver and Southern Health Partners under N.C. Gen. Stat. § 1D-15.

416. Plaintiff is also entitled to recover reasonable attorneys' fees and litigation expenses from Defendants pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court for the following relief:

1. Compensatory damages from Defendants, jointly and severally, for Mr. Parker's personal injuries and wrongful death;

2. Punitive damages from Defendants Driver, Southern Health Partners, Sparks, Narron, Santagata, Garner, Lee, Woodall, Arias, Hines, Neal, and Grainger under 42 U.S.C. § 1983;

3. Punitive damages from Defendants Driver and Southern Health Partners under N.C. Gen. Stat. § 1D-15;

4. Reasonable attorneys' fees and litigation expenses from Defendants under 42 U.S.C. § 1988;

5.      Costs of court and interest as allowed by law;

6.      A trial by jury on all disputed issues of fact; and,

7.      Such other and further relief as the Court may deem just and proper.

This the 13th day of June, 2019.

/s/ Matthew S. Sullivan
White & Allen, P.A.
P.O. Box 3169
Kinston, NC 28502-3169
Telephone: 252-527-8000
Facsimile: 252-527-8128
msullivan@whiteandallen.com
N.C. State Bar No. 22343
Counsel for Plaintiff

/s/ Carlos E. Mahoney
Carlos E. Mahoney
Glenn, Mills, Fisher & Mahoney, P.A.
P.O. Drawer 3865
Durham, NC 27702-3865
Telephone: 919-683-2135
Facsimile: 919-688-9339
cmahoney@gmfm-law.com
N.C. State Bar No. 26509
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I, Carlos E. Mahoney, hereby certify that on June 13, 2019, I electronically filed the foregoing document entitled, **Amended Complaint**, with the Clerk of Court for the Eastern District of North Carolina using the CM/ECF system which will give notice of the filing to the following.

Scott C. Hart
Sumrell, Sugg, Carmichael,
Hicks & Hart, P.A.
P.O. Drawer 889
New Bern, NC 28563
shart@nclawyers.com
Counsel for Defendants Sheriff Pierce
Wayne County, and Western Surety

W. Gregory Merritt
Harris, Creech, Ward & Blackerby, P.A.
P.O. Drawer 1168
New Bern, NC 28563
wgm@harriscreech.com
Counsel for Defendant Southern
Health Partners

Dan M. Hartzog, Jr.
Cranfill Sumner & Hartzog, LLP
P.O. Box 27808
Raleigh, NC 27611-7808
dhartzogjr@cshlaw.com
Counsel for Defendants Sparks, Narron,
Santagata, Garner, Lee, Woodall, Arias,
Hines, and Neal

Matthew S. Sullivan
White & Allen, P.A.
P.O. Box 3169
Kinston, NC 28502
msullivan@whiteandallen.com
Counsel for Plaintiff

Orlando L. Rodriguez
Assistant Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
orodriguez@ncdoj.gov
Counsel for Defendant Grainger

/s/ Carlos E. Mahoney
Carlos E. Mahoney
Glenn, Mills, Fisher & Mahoney, P.A.
P.O. Drawer 3865
Durham, NC 27702-3865
Telephone: (919) 683-2135
Facsimile: (919) 688-9339
cmahoney@gmfm-law.com
N.C. State Bar No. 26509
Counsel for Plaintiff